case number 23-1116. People v. Juwan Welch. Good morning. My name is Sanjay Kaler. I'm the Presiding Justice of the 6th Division of the First District Appellate Court. I'm joined by my colleagues on the panel this morning, Justice Michael Hyman and Justice Celia Gamrath. If I can ask the counsel to introduce themselves and counsel for Appellant, if you could let me know how much of your 20 minutes you would like to reserve for rebuttal. I would appreciate that. And so you'll have 20 minutes total and then the Appellant will have 20 minutes total. So go ahead. My name is Rebecca Levy from the Office of the State Appellate Defender and I represent Juwan Welch. And I would like to reserve five minutes for rebuttal, please. Okay. Thank you, Ms. Levy. Sorry. Good morning. Susan Wabichand, Assistant State's Attorney on behalf of the people of the State of Illinois. Okay. Thank you, Ms. Wabichand. So Ms. Levy, you may proceed. Good morning, Your Honors. My name is Rebecca Levy, like I said, from the Office of the State Appellate Defender, and I represent Mr. Welch. Today, I'm going to focus my argument on the first two issues that I raised in the brief and explain why the state did not prove Mr. Welch guilty beyond a reasonable doubt and also why the trial court erred in admitting the rap music video as evidence in the case. But I would, of course, be happy to answer questions about any of the issues if you have them. The state failed to prove Mr. Welch guilty beyond a reasonable doubt of unlawful possession of a weapon by a felon. Mr. Welch was riding as a passenger in the car, the front seat passenger. He wasn't driving the car. He didn't own the car. Police pulled the car over because the driver and passenger were not wearing seat belts, and the car pulled over, the driver pulled over, and as the... We know the facts. When you get down to it, what is the crux of the, in your opinion, the issue? The issue is that he had no knowledge that the gun was, there's no evidence that he had the knowledge that the gun was present in the car underneath his seat. It wasn't... You say underneath his seat. In the video, when the officer bends down, you can't see where he's... But it looked like he took the seat off. What was happening? What were we seeing? I'm unclear about what's happening in the video as well. The officer says he reaches under the front seat and finds the gun just there level, parallel with the edge of the seat so that if... The officer said that if he would have stuck your hand under, you would have felt the gun. It wasn't visible. No, it was not visible. You had to put your hand underneath the testimony, so... Yes, correct. Yes, the officer testified to that. He said it wasn't visible, and that he did have to put his hand under the seat, but that he found it quickly after putting his hand under the seat. That's what... Do we know the size of the gun? I mean, did it have an extended magazine? They did say that, the officer testified that it was recovered with a magazine of 30 rounds. So there was a magazine attached to it. I don't... A picture of the gun itself was not introduced. The gun itself was introduced at trial, but not a picture of it. So we don't see it, but the court did. The gun that was introduced at trial, did it have the magazine? I believe so. I believe it did. The YouTube video, is the gun that's shown there, is it shown with a magazine? Um, I believe it is. I've watched it, you know, my knowledge of gun parts is not that expert, I would say. It looks to me, I think that there's a magazine attached to it in the video. Was there any testimony? Is there anything in the record? No, there's not testimony. It's just that the state's attorney argues, in closing argument, and then the judge agrees in closing that the gun in the video looks similar to the gun recovered from underneath the front cover. So why is looks, why shouldn't looks be an inference that the court can take? Well, we don't know. I mean, that's speculative. The gun looks like the same gun. We also, importantly, we don't know when the video was made. This video could have been made years ago, years earlier, or a year earlier, or months earlier. There's nothing, there's no temporal link between the video and the gun. No temporal link. But how important is a temporal link if there is distinguishing characteristics that have been identified? For example, here, the state said that it had the same markings in the same handle cover, same silver piece, same curvature near the trigger, and it had an extended, or it had a magazine. So does it matter that the, you know, isn't a temporal link, like in the other case that's cited by the parties, or by you? Well, I think it does matter. First of all, I mean, I think we can presume that a gun it's not just, I assume it's not a special, there's no evidence that there's no evidence there was a special model that was only one made. So the fact that it looks similar doesn't mean that it was the same gun. And as I said, I mean, they're not wearing, in the case, I think it's, it might be Brogan or Davis. One of the cases I cited in my brief, and I believe it's the first issue, but they were wearing, there was a video introduced or a picture, and they were wearing the same clothes that they had been wearing when they were, the defendant had been wearing when he was arrested in the car, in a different case, like I said. So the inference was that it was made close in time. Yes, correct. So close in time to when the defendant was nearly gone. So I believe that this video was posted in 2022. That's what the video says, posted 2022. It does on YouTube. Okay. And the arrest was February 2022. So at most, you've got less than two months to pass. Isn't that temporal enough? I believe he was arrested in February 2021. Or, okay. Am I wrong? I'm sorry if I'm wrong about that. Maybe I'm wrong about the posting. I thought that the posting was the same year. Okay. Yeah. But we'll go back and check that. But if that's correct, that it was posted in the same year and the arrest was February. Isn't that temporal? Two months. I mean, it's, you're saying it was posted in, I mean, we know that you're saying it was posted in February of 2022. I'm sorry. Sometime in 2022? My recollection looking at the video was it said, posted, I thought it said 2022. Maybe it was 2021. But my recollection, and again, we'll definitely go back and check that. But I didn't see that that came up at trial. It didn't. It's correct. We don't even know how the police came to find the video and show it to the defendant. That's not even an evidence. I don't know that the version shown to him in the police station is the same version that's that's not even, there's no evidence of that. There's also no evidence that the video that's on YouTube is the exact same year they introduced at trial. I mean, I presume that's not an issue that's been brought up. I presume it was, but I, and to be clear, I didn't go outside the record. I'm looking at the video. I wasn't fishing outside. I did. I mean, I Googled the video on YouTube. That's why I, so I understand. I got it. I took it from the record. Okay. Well, it's still, it's, I mean, two months is, it's closer than no timeframe, apparent, I guess, but it's, I think that two months are, is still, it's, it's, it's, it's closer. It's better than nothing, but it's not. What do we know? You said that's when it was posted. We don't know when it was made. It could have been made. When it's posted, it doesn't mean anything, does it? Why would that mean anything? It's when it was made, it could have been made a year before, two years before. Who knows when it was made? The fact that it was posted, what's a, does that have a connection to this case being posted? Even if it was, would that make a difference if it was made a year before? I don't believe it would. I don't, I mean, I think that when it's, the time it's posted is not as relevant as when it was made, obviously. I mean, when it was made is more informative of when he might've had a similar look. Wasn't that more going to the other case, maybe Bailey or whatever, the other case where it was the same day, but it was made that day. I mean, it wasn't that it was posted. It's clear that it had been made and posted the same day. Right. Correct. That's the difference. I don't even know if it had been posted in the other case. It was just made. They had a copy of this video. Correct. Yes. Yeah. We don't know. Thank you, Justice Hyman. Your client admits that he's in the video. Yes. He admits he's in the video. He does not admit that it's the same gun. Does he deny that it's a gun in that video? He's not asked. He just was asked if it's the same gun and he said, no. No. He's a felon. He's not allowed to have a gun. And so if there was a real gun, would that be a violation for him to have? If it was a real gun, yes. And that's why the second argument we've raised is that the court improperly admitted other crimes evidence, which it thought was not other crimes evidence. And I understand that this was a bench trial and that the court is presumed to know the law. But in this case, the court very adamantly stated that it absolutely was not other crimes evidence. The video did not constitute other crimes evidence and it was admissible. Presumably, for any reason, I mean, the court didn't even say what it was admitting it to show. And clearly the court used it, the video, to find Mr. Welsh guilty. Without the video, the court even acknowledged that there wouldn't be a case. The whole case turns on that video. There is no video, there is no case. Yes. Yes. And the video, the video does show the gun with the magazine attached, right? Yes. I mean, I believe so. I'm not, like I said, I'm not knowledgeable about firearms. Well, I shouldn't speak for anybody, but I'm certainly not. But I mean, what I see in the video is fairly distinctive in terms of the magazine looks sort of circular. There are two guns in the video that he holds at different times. And at one time, I think he holds both towards the beginning. And the gun that we're talking about is the one that is in the beginning and is in his right hand at nine seconds. I don't recall off the top of my head which one has the circular, but you're right. It does look very unique. I'm not, I don't recall if it's this, if that's the gun that they're claiming this one was. So that may not be the Glock, the one with the circular. Right. Okay. It might be the other one, because he's holding two guns in the video. Yes, that's right. There's, at one point he's holding two different guns. You can see on the other gun, at least, that there appears to be a long attachment at the bottom of the gun. Yes, there does. I mean, we don't know if it's loaded. I mean, like I said, in the opening brief, or in both my briefs, the reply as well, that, I mean, it is a rap music video. It's not real life. It's, I mean, it's produced by some kind of production company. And as I said also in my brief, that the sound of the video, there was no need to have the sound on, just to have, even if they were showing that the gun was similar, the music and the lyrics of the rap that he's singing is very prejudicial. This is a bench trial, right? Yes, it is. I understand if it was a jury trial, but I mean, the judge indicated that he wasn't considering this as evidence of other crimes, but rather as evidence of this crime. So why shouldn't we, you know, take the court at its word there? He's an experienced trial judge. He is experienced. He's a very experienced trial judge. I don't disagree. However, he specifically said on the record that this was not other crimes evidence. And that is wrong. It is other crimes evidence. It doesn't, the judge said it doesn't constitute other crimes evidence, but it he wasn't considering it. He wasn't considering it as other crimes evidence. He didn't, he didn't say that. I mean, he said that he just said it wasn't other crimes evidence and it didn't constitute it. He doesn't, I mean, that's, that's just wrong. It does constitute other crimes evidence. So whether he, him saying he's not considering it as other crimes, he said that he, it wasn't other crimes evidence. But it is, I mean, it's evidence presumably of two other crimes, if he's holding two different guns and he's not allowed to have one. You have one more minute, so if you want to. Oh, I, I, thank you. I, I, unless you've had other questions, I would like to reserve my time. The remaining. Well, I mean, you have one more minute. One more minute. I'm so sorry. I believe I pretty much covered everything I was going to say. Other than, I mean, I just want to reiterate again, how prejudicial the video was. The judge saw it and then you could, from reading the transcript, you could see his tone just changed. There was no objection to the, was there an objection given during the trial to the audio? I believe she objected post-trial to the audio. Right. So, but at the time. She objected to the whole video being introduced. Like she didn't want. I understand, but there was no. Yes, but with regard to the audio, specifically after the judge said, no, I want to. I'm going to let it in. Nobody said, well, what about keeping the sound off? I don't believe. No, I don't believe she did at that point. She did have one question for you. What? I'm sorry, before I finish. I'm not, I am finished. I do have one question for you. The officer said that. The defendant was nervous and he pointed out that his hand was shaking and he was sweating, even though it was cold. Is that a factor that we may consider in. Determining whether the defendant had knowledge of the gun. It's a factor you can consider. I don't think it's a significant factor. I mean, it's February, so it's cold out and I mean, him shaking could be him shivering and. I mean, I don't think it's very uncommon for people to be nervous when they get pulled over by the police and then ordered out of the car, regardless of who they are and what time of year it is. I understand that the officer testified that no one is ever nervous unless they're holding contraband, but. Yeah, I mean, I, and the court found him credible, but I mean, that statement is kind of. Incredible in general that no one has ever. Pulled over has ever been nervous unless they had contraband. It seems highly unlikely, but he did testify to that. I don't think that. A man being ordered out of a car after being pulled over who's already been arrested before. Um. It's at all unusual for him to be nervous, and I don't think that that is a factor in in this case in determining that he had knowledge of the gun's presence. So, thank you and I ask you. As I read the transcript, I see that the video comes in. The judge says it's not other crimes of the judge is using it to say I am recognizing some connection here between this defendant and this gun because it's the same gun. He was holding in this video, so I'm using it for this other purpose, not for other crimes. We're not going to convict him for holding a gun in that video, and I don't see anything where the judge says, oh, this is a, you know, terrible person because of these things he's saying in the video. There was nothing to tie that up either. So, what's wrong with judge letting this video in for that purpose that just simply ties and makes that connection between this person and this gun, which has already been factually determined to be distinct, according to all those markings and so forth? Could you explain that? Well, I guess I'm asking, the question would be, I know this is your question, but what is the purpose of it being introduced? There has to be a specific purpose. It's not propensity. So, it would seem to me if the judge is using it to, for knowledge or to know, he had this gun on this prior occasion and now he has it again, that goes to propensity, doesn't it? I mean, if he, they're using it to show it's the same gun. I understand that it could be used to show possibly another purpose for admission that's not improper. I mean, in various other cases, you know, I've had it's admitted to show identity or not, or various specific, specific purpose, specific purpose. In this case, there isn't one. I mean, the judge didn't say I'm admitting it for this reason. Well, I think it was the Bailey case that you were referencing, I think that's the name of it, where there was that temporal link. Maybe it's not Bailey, but it's the one with the temporal, where they were wearing the same clothes. So, in that case, they let it in and that was fine. Why wouldn't it be fine here? Well, I mean, I don't want to say that, again, this temporal link is the difference. There is no I would say foundation even for the video in that we don't know when it was made. So, it almost doesn't, there's not a relevancy that the court identified in its admission. Do you know what I mean? Like, the court didn't say, I mean, this is other crimes evidence, but I'm not admitting it for that reason. I'm admitting it to show identity. It didn't, the court didn't say that. And it doesn't. Thank you Ms. Levy. Ms. Lobekind. May it please the court. Susan Lobekind on behalf of the people of the state of Illinois. Your honors, the evidence when construed in a light most favorable to the people proved beyond a reasonable doubt that defendant possessed the firearm recovered from underneath his seat and was guilty of unlawful possession of a weapon by a felon. Seems defendant is not saying that he did not have control over the weapon at this time. And indeed, the weapon was found directly under defendant's seat within his easy reach, which does establish his control over it. As he didn't know about it, but he didn't, we don't know about knowledge. Correct. Correct. So that, that does raise the inference that he had knowledge, but then the facts and circumstances surrounding the finding of the gun and the traffic stop does support a finding of knowledge. How's that? How's that? Well, we have defendant's conduct during the where he was acting nervous and officer Rodriguez. What is nervousness? I mean, you don't believe people get nervous when they see police officers, particularly with their, have a record. I do believe people do. I mean, I get nervous when I get pulled over. However, officer Rodriguez said that he was acting more nervous than usual. How do we know what that means? I mean, what, what is usual to the police officer? What does he call you? Nervous? It was when, uh, when you go from a warm car to a cold outside, can you sweat? Could you be hot in a car? Could the car be hotter? And it could be, he could be sweating. He had a coat on. Correct. Right. When he got outside, he could be shivering because we could see the back of his pants. You know, I mean, yes, I do. I agree with all that. The officer did say that he was acting more usual, you know, more nervous than the usual person does. He was shaking. He was sweating. Um, to the point where one of the officers said, are you good? You know, he was clearly acting like there was something wrong. Um, and then at that point, it's up for the trial judge to determine, um, the credibility and the weight to be given to, to officer Rodriguez's testimony as to, um, defendant's conduct. And then in addition to defendant's conduct, um, that suggested his guilty conscience, we have his previous felony conviction, which generated the inference of culpable knowledge, um, as this court found in McKnight. And then we have the video. So do you agree? Do you, you agree, uh, with the judge without the video? There is no case. No, I do not agree. I agree to that. So we can throw out the video and you still win. Is that, that's what you're saying? I believe that we could, yes, it wouldn't be quite as strong of a case, but we do still defendants conduct. We do still have contact being as nervousness. Yes. Yes. That, that, so somebody being nervous is enough to convict them of, uh, having knowledge. Well, um, that's, that's the law. It could be, there is no law. There is no law that, okay. As to the minimum requirement, um, what is required for the knowledge from his conduct, it can be inferred that he knew, um, how, how is that? Because he was nervous, you're saying it going back or because he was sweating. Correct. He's correct because, um, I wasn't there. I didn't see how he was acting, but officer Rodriguez did, and we only have his testimony and we also do have the video. We have the video. I, I saw, I didn't, I couldn't see the sweat. I mean, I don't know if anybody else did, but, um, he's shaking. We could be seen on video. At one point it does say, um, you can see his hands shaking. Um, and, and, you know, there was no testimony either as to how cold it was that day. I mean, we're presuming because it was February, it was very, very cold. We don't know. There was no testimony as to that. Um, it was not asked at trial. Um, was he shaking because it was colder or how cold was it? So we don't know. So all we have is the testimony. Um, all right. So let me ask you, cause you're saying his conduct. So let's assume he was nervous. What else besides the video you mentioned McKnight and the previous conviction would give some sort of inference of knowledge. Is that your argument? Yes, it generates the inference of culpable knowledge. So we have those two together. We don't have to take them each separately. We look at the entirety of the circumstances. So we have those two things standing on their own. And then we do have the video of defendant holding a gun that was identical. The court found it identical to the recovered gun, um, which suggested that the gun was the same as the one recovered and suggested that defendant had a possessed free interest in it, which supported another, the conclusion that he knew of the gun's presence in the car and as well, the gun's location. How do we know it's identical? There is no testimony by an expert. Uh, the Glock gun is one of the most popular guns in the country. They make a lot of them. Um, and the case law Bailey and other cases say that, uh, there has to be some proximity and, uh, we don't know anything about when this was made. In fact, we don't know when it was posted. I mean, there's nothing in the record with regard to that. Well, the judge did find, and, um, the judge did was holding the gun at the time he had, you know, she had privy to seeing the gun in person that we unfortunately don't have. And we have the video. But that's not the, that's not the issue. Uh, we know he had the gun that was under the car, the judge did, but how does the judge know? I mean, the judge is not an expert on guns and the judge is looking at a video. We're looking at the same video. Uh, and the judge is making a determination. It's the same based on no testimony. Well, based on the judge had the gun while it watched the video, the gun apparently had some, um, markings that made it a little bit different than your run of the mill gun. It had silver on it. It had a Brown handle. It had a curvature. Um, the video was paused. They paused it at a specific point and said, this is the gun. And it's a closeup of the gun. And it was, somebody asked earlier, it was the gun with the big round, um, extended magazine. Um, so you can see in the video that there are different, that the gun is a little different. So do we know 100% that it was the identical same gun? No. Well, the same gun. No, the judge did make the finding that it was identical. And from that finding, the judge was allowed to infer that it was the same gun. Now we have that and we have the other circumstances surrounding this stuff. When you put those all together, um, it does support the conclusion that defendant knew the gun was there. And as well, I was, um, about to say the guns location up front, it wasn't tucked all the way under the seat. It was just at very front edge of the seat also supported. It was not, it was not, it was not seeable. It was under the seat that the testimony was correct. It was under the seat, but not tucked all the way. Does it matter whether it was tucked or not? It does because it makes it's more proximate, the proximity of it to defendant made it more easily accessible to him. And it also did sitting there. He's sitting there. It's not his car. Correct. How many times he, any testimony on how many times he's been in that car? No, there was not. Uh, we know he was ever in that car before. Nope. It's not even his, uh, sister's car. It wasn't. Uh, no, no. So I mean, it could, anybody could have a car with a, uh, a Glock gun. I mean, if that is quite possible and, and, and he had chicken on his lap. Um, I mean, he, he was very, uh, uh, uh, polite to the police. He did everything they asked. He never, uh, said anything untoward. He did. He was very cooperative. I mean, is, you know, you're talking about him being nervous and everything, but on the other hand, if he knew there was a gun underneath, why did he just act the way he did? I mean, that was a very, uh, you know, you would expect that that's the way you should handle a situation like that. Right. Particularly if you're not guilty. Correct. Right. Well, I mean, flight or, um, being rude to the officers isn't required to show that he knew the gun was there. Perhaps he was hoping that the gut, that the officers would, um, think he was innocent and not search the car. I don't know why. I'm talking about even after, after he got out, you know, when they handcuff him and everything else, he never says anything untoward. He doesn't correct. He just does exactly what they tell him. Right. Yes. But it's not required. That does not mean he didn't know about the gun. It's not required. That doesn't mean that he did or didn't. I mean, the question is how someone can tell a stranger, uh, based on their actions that he's a stranger to the officer based on those actions. What do we know? Well, the officer can, does have his experience in the field and compare, can compare defendants actions and conduct to how other people in that situation behave. Um, and the trial court wasn't required to seek out every possible explanation of innocence, um, beyond a reasonable doubt. And so the trial court looked at all this circumstantial evidence as a whole and said, it supported the finding that defendant knew of the gun. Let me ask you two questions. One is, um, in reviewing the video at timestamp eight minutes, 26 seconds, the officer asks Ms. Flatey, she has a void card and she shows it to him. And then the officers heard saying that Flatey says she doesn't own a gun. Um, is there anywhere in that video where we actually overhear where, where Flatey can be heard saying that she doesn't own a gun? Um, I have not watched the video in a bit of time. I don't remember though any evidence or any, um, testimony regarding it. Okay. And then the second question, um, is, um, when I looked at the video, it seemed that the officer, you know, ducked down to look underneath the seat a couple of times. Um, and if I'm remembering it correctly, he retrieved the, um, gun at some point, um, um, but I'm not exactly sure which time he retrieved the gun and took it back to the squad car. Did you, um, do you know the sequence of events there? I do not remember how many times he looked at the gun, uh, looked underneath the seat. I do remember it was hard to see from the vantage point exactly where he was looking and what he was doing, um, at the time of the recovery. Um, I just know what he said about where it was positioned underneath the seat and that it was not tucked all the way underneath it, hidden, you know, all the way underneath the seat. Do you agree that it's speculation that the guns are identical? Um, I believe that it was a finding for the trial judge to make and that it was an inference that could reasonably be made. But it's, it's, he doesn't know for sure. There's no direct evidence. So it's, it's speculative. You would agree. It's circumstantial. It's circumstantial. And that's, that's the only thing we have is that the guns look alike, right? That the guns look alike. And, and as they said, it's same markings. There were several points on the gun that they identified as being the same gun. Um, I mean, it would be quite the coincidence that he has a gun that looks exactly the same in a video. And then that gun shows up in his car. Right. If it's a, if it's a popular gun, it's a well-known gun. They don't make just one of them and there's hundreds of thousands of them. Why would that be? Well, we don't know how popular the gun it was. Um, and then the gun does have the extended magazine on it. And, um, again, that was just, um, an inference that the court could make in light of the entirety of the evidence, um, that it was the same gun. How do we know that the car didn't belong to the person who made the video and that there was there? I mean, there's a, there seems to be some, uh, a lot of speculation with regard to how the gun got there, which he possibly could, didn't know. But if somebody made video, you're assuming, I assume that he brought the gun to the video and it was his gun or that somebody could have given him the gun and that gun could have been in the car. And that is reasonable. I mean, there, there are a lot of other explanations. There are. And when there are conflicting inferences, like when the evidence can, can cause conflicting inferences like that, it was for the trial judge to determine which inference the court believed. I had said the case Bailey, but I think it was Bradley and Bogan that I was thinking of. And those cases were the cases where, you know, there were photos on one of the defendant's phones. And then the other one was a Snapchat video recorded when they were wearing the same clothes, presumably the same day. So thinking about that temporal proximity, is that game changer that is not present here because we don't know when this video was made? Um, no, as certainly it's something that can be used to determine the weight to be given the evidence. Um, in Bradley, yes, there was more evidence against the defendants because they were wearing the same clothes. Um, and it did, there did seem to be more of a temporal link. Um, however, a gun is a gun. It's going to be the same gun today, next year, six months, two months, um, from now. So it's that, that just goes to the weight of the evidence and determining whether it is the same gun and whether, and, and how much it does, um, establish defendant's knowledge of it under the seat. Ms. Slovakine, you have, uh, one minute. Uh, your honors, I would just like to say too, that the, I'm sorry, I'm sorry. You, you actually have five minutes. Um, I will, I'll move on to the second issue then if, if, uh, nobody has any more questions as to the reasonable doubt issue. Um, so counsel was saying that the court did not say why it admitted the video and the court said many times that it was admitting the video because it went to defendant's knowledge of the weapon as we've been discussing in the first issue as well. The court said multiple times that it did not view it as other crimes evidence, that it was not propensity evidence, and that it went to the defendant's knowledge of the gun. Um, could it be other, could, it could be other crimes evidence in this case because in this case, as opposed to some of the cases cited in the briefs, uh, we have a, who is a felon. Um, so counsel saying, you know, we don't have the temporal link to show that the, that the video wasn't probative, um, of his knowledge, but then at the same time, we don't have the temporal link. So we don't even know if defendant was a felon at the time the video was filmed. We know he was most likely at the time the video was posted because there is that date stamp of 2022. Um, however, we don't know. We could not convict defendant of UUWF of that, of the gun in the video based solely on that video. So, um, it's our position. It was not other crimes evidence. And even so, even if it was other crimes evidence, it would still be admissible because it was not propensity evidence. Um, it went to defendant's knowledge as I, as I've, um, keep saying, um, which is an admissible reason to, to allow, um, other crimes evidence. And, um, counsel had said in their brief that the court didn't do, if it was other crimes evidence, the court then didn't do the proper, um, analysis of allowing it in and determining whether it was more prejudicial than probative. However, the court's ruling that the evidence was not other evidence goes to show that the court did not consider it that way. And so the video could not have prejudice defendant. And the court did say that nothing in the video, not the audio, not the video itself had any impact on its rulings. And it also did, did, um, indicate that it did not believe that defendant was a bad person when defense counsel insinuated that the court was, um, did believe that. So the, the video was admissible. However, you look at it, if you want to look at it as other crimes, which as I said, I assert it was not, it was nevertheless admissible, um, because it went to defendant's knowledge and it was not more prejudicial than probative. And it was very probative of defendant's knowledge. Um, so with all that said, the trial court did not abuse its discretion when it allowed the video and, um, and the, and the evidence in its totality did prove defendant guilty beyond a reasonable doubt. And as to the other two issues, I will rest on my, on my brief. And if nobody, I, that's, that's it. Thank you. Any more questions for, um, Okay. Thank you, Ms. Levy. Five minutes for rebuttal. Hi. Um, you know, I'm going to also stand on my, my argument, unless you have any other questions, anyone has questions. What about the argument that we just heard that, um, it goes to, uh, knowledge, the video goes to knowledge, uh, even whether or not it goes to something else, it, it, they're saying, uh, state says it goes to knowledge and that the judge used it. He said, I'm not using it for anything else other than that, basically. I mean, he's, he's saying quite clearly, that's why he denied the motion. So what's your response? I believe that the judge wrongly, um, proclaimed immediately that it didn't constitute other crimes evidence. And in fact, it does. Um, let's assume it does. Let's assume it also, but can it also, can it also show notice, uh, uh, show knowledge. It could show knowledge if there had been a temporal connection. Um, there's that's just still missing and there's no, um, evidence that he, that the defendant knew that the gun was in the car. Um, I, I mean, it, it is other crimes evidence to make that leap. Um, it is, it's, it is propensity evidence to make that leap is what I meant to say, but, um, and then the court rejecting the idea that it has to shoot other crimes evidence and abandoning that the balancing test about whether it was more prejudicial than probative is manifest error, um, on its own. And this court should reverse on that basis. Why do you think, why do you think that court abandoned the balancing test just because he didn't say it out loud? The judge specifically stated that this does not constitute other crimes evidence. And so if the court didn't believe that the video constitute other crimes evidence, there would, there was no need for him to do the test. He didn't do it because he didn't think it was necessary, um, as, because he believed that the evidence was not other crimes evidence. It didn't constitute other crimes evidence. So he did not do the balancing test. That's the record shows that. So I take your position that other crimes evidence can never come in for another purpose and let you do the formal balancing. Yes, that is our, that is my position. The court is required to balance the probative, the probative value against the prejudicial nature of the evidence. They're required. It's required. That's, that's our position, my position. Thank you. Okay. Any more questions for Ms. Levy? Okay. Um, thank you, Ms. Levy. Thank you, Ms. Wolbekind. Um, we appreciate your zealous advocacy. The case is submitted and the court will issue a decision in due course.